**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ELLIOT FEDER, Derivatively on Behalf of Nominal Defendant BOSTON SCIENTIFIC CORPORATION., | Case No. 1:26-cv-11864 |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| MICHAEL F. MAHONEY, JONATHAN R. MONSON, KENNETH M. STEIN, JOSEPH M. FITZGERALD, NICHOLAS SPADEA-ANELLO, YOSHIAKI FUJIMORI, DAVID C. HABIGER, EDWARD J. LUDWIG, JESSICA L. MEGA, SUSAN E. MORANO, CHERYL PEGUS, JOHN E. SUNUNU, DAVID S. WICHMANN, AND ELLEN M. ZANE, | |
| Defendants, | |
| and | |
| BOSTON SCIENTIFIC CORPORATION, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Elliot Feder ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Boston Scientific Corporation ("Boston Scientific" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers (the "Individual Defendants[1]") to remedy their breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal

[1] The Individual Defendants are Michael F. Mahoney, Jonathan R. Monson, Kenneth M. Stein, Joseph M. Fitzgerald, Nicholas Spadea-Anello, Yoshiaki Fujimori, David C. Habiger, Edward J. Ludwig, Jessica L. Mega, Susan E. Morano, Cheryl Pegus, John E. Sununu, David S. Wichmann, and Ellen M. Zane.

knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of filings in related actions, the Company's publicly available documents, conference call transcripts and announcements made by the Individual Defendants and the Company ("collectively, "Defendants"), United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Boston Scientific, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought on behalf of Boston Scientific against the Individual Defendants, certain officers and directors of the Company, for violations of federal law and breaches of their fiduciary duties.

2. The Individual Defendants made and/or permitted the issuance of false and misleading statements regarding, *inter alia*, Boston Scientific's expected growth rate for fiscal 2025. Defendants repeatedly issued positive statements concerning the sustainability of growth in key product segments and repeatedly elevated full-year guidance metrics while failing to disclose material adverse trends affecting procedure volumes, competitive pressures, as well as regulatory and reimbursement headwinds that ultimately necessitated lowered expectations. Defendants also made and/or permitted the issuance of false and misleading statements and/or concealed material adverse facts concerning the true state of Boston Scientific's U.S. EP segment – notably, that the segment's growth rate was unsustainable and that it was approaching an earlier tipping point than the market was anticipating.

3. On February 4, 2026, Boston Scientific published a press release announcing fourth quarter and full year 2025 results, including a pertinent disappointment in U.S. EP sales, and issued guidance for fiscal 2026 that fell well below expectations. The Company attributed its results and dismal guidance on a combination of slower than expected market growth alongside increased competition, despite management's previous claims of a "growing" EP business and assertions they "have a very good understanding of what competition we will face and in what time frame." On this news, the price of Boston Scientific's common stock declined dramatically. From a closing market price of $91.62 per share on February 3, 2026, Boston Scientific's stock price fell to $75.50 per share on February 4, 2026, a decline of about 17.6% in the span of a single day.

4. The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the impact new entrants to the market would have on the EP segment was understated; (2) the growth rate and competitive advantage of the EP segment was overstated; (3) the Company's financial outlook lacked a reasonable basis; and (4) Defendants failed to maintain adequate internal controls and reporting systems, which itself was a breach of their fiduciary duties.

5. Moreover, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, at least six of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of nearly $40 million.

6. As a result of the foregoing, a securities fraud class action was filed against the Company and certain of the Individual Defendants in this Court (the "Securities Class Action").

7. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial harm, including the costs of defending against and

potential class-wide liability in the related Securities Class Action, as well as additional damages, including reputational harm and loss of goodwill.

8. Plaintiff did not make a demand on the Board to bring this action against the Individual Defendants because such a demand is futile. As detailed further herein, a pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action.

**JURISDICTION AND VENUE**

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

10. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Massachusetts or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

13. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

the United States mail, and the facilities of a national securities market.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Nominal Defendant Boston Scientific is headquartered in this District and conducts business in this District.

## PARTIES

***Plaintiff***

15. Plaintiff is, and has been at all relevant times, a shareholder of Boston Scientific common stock.

***Nominal Defendant***

16. Nominal Defendant Boston Scientific is a Delaware corporation headquartered in the State of Massachusetts.

***Individual Defendants***

17. Michael F. Mahoney has served at all relevant times as the Company's Chief Executive Officer and a director of the Board since 2012. Defendant Mahoney has served as the Company's President since October 2011 and as Chairman of the Board since May 2016.

18. Jonathan R. Monson has served as the Company's CFO since June 30, 2025.

19. Kenneth M. Stein has served as the Company's CMO since February 2023.

20. Joseph M. Fitzgerald served as Boston Scientific's executive vice president and president, Rhythm Management beginning February 2014 and became Boston Scientific's executive vice president and president, Interventional Cardiology effective July 6, 2020. Fitzgerald has served as the Company's Executive Vice President and Group President of Cardiology since May 2022.

21. Nicholas Spadea-Anello has served as the Company's Global President of EP since January 2025

22. Yoshiaki Fujimori has served as a member of the Board since July 2016. Fujimori also served as the Chair of the Risk, Science, and Technology Committee at all relevant times.

23. David C. Habiger has served as a Company director since July 2024. Habiger also serves as a member of the Audit Committee and the Executive Compensation and Human Resources Committee.

24. Edward J. Ludwig has served as a member of the Board since March 2014. Ludwig has served as a Company director since March 2016 and as Lead Independent Director since May 2016. He also serves as a member of the Audit Committee and the Nominating and Governance Committee.

25. Jessica L. Mega has served as a Company director since June 2023. Mega also serves as a member of the Executive Compensation and Human Resources Committee and the Risk, Science and Technology Committee.

26. Susan E. Morano has served as a Company director since June 2023. Morano also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee.

27. Cheryl Pegus has served as a Company director since May 2024. Pegus also serves as the Chair of the Risk, Science and Technology Committee and as a member of the Executive Compensation and Human Resources Committee.

28. John E. Sununu has served as a member of the Board since April 2009. Sununu has served as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee at all relevant times.

29. David S. Wichmann has served as a Company director since June 2021. Wichmann also serves as the Chair of the Audit Committee and as a member of the Risk, Science and

Technology Committee.

30. Ellen M. Zane has served as a member of the Board since April 2016. Zane also serves as the Chair of the Executive Compensation and Human Resources Committee and as a member of the Nominating and Governance Committee.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

31. By reason of their positions as officers and/or directors of Boston Scientific, and because of their ability to control the business and corporate affairs of Boston Scientific, the Individual Defendants owed Boston Scientific and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Boston Scientific in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Boston Scientific and its shareholders.

32. Each director and officer of the Company owes to Boston Scientific and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Boston Scientific, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34. To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Boston Scientific, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ stock exchange, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37. To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Boston Scientific were required to, among other things:

(a) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Massachusetts and the United States, and

pursuant to Boston Scientific's own Code of Conduct;

(b) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Remain informed as to how Boston Scientific conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Boston Scientific and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Boston Scientific's operations would comply with all applicable laws and Boston Scientific's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38. Each of the Individual Defendants further owed to Boston Scientific and the shareholders the duty of loyalty requiring that each favor Boston Scientific's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39. At all times relevant hereto, the Individual Defendants were the agents of each other and of Boston Scientific and were at all times acting within the course and scope of such agency.

40. Because of their advisory, executive, managerial, and directorial positions with Boston Scientific, each of the Individual Defendants had access to adverse, non-public information about the Company.

41. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Boston Scientific.

**<u>BOSTON SCIENTIFIC'S CODE OF CONDUCT</u>**

42. Boston Scientific's Code of Conduct expressly applies to Company directors and officers, *i.e.*, each of the Individual Defendants.

43. In the section titled "Avoid Conflicts of Interest," the Code of Conduct states, in relevant part:

> You may encounter a conflict of interest when your personal interests conflict with Boston Scientific's interests. Boston Scientific expects you to use your best efforts for the Company's success and, in some cases, your personal interests may impact your ability to make sound and objective decisions. You should avoid engaging in any activity that is, or could appear to be, a conflict between your interests and those of Boston Scientific. You are responsible for understanding the Company's policies on conflicts of interest and being open and forthcoming about actual or perceived conflicts should they arise so that situations can be addressed appropriately…

44. In the section titled "Be Careful with Records," the Code of Conduct states, in relevant part:

> You are responsible for maintaining accurate and complete business records. Prepare records thoughtfully, always double-check your work, and follow any applicable documentation policies. No one should falsify or improperly change any Boston Scientific records. If you are not sure about the accuracy of information, do not guess. Do what you can to find the correct information or discuss the situation with your manager. For further information, please consult the Good Documentation Practices procedures.
>
> General best practices to ensure business records are accurate and complete include: being accurate with your time and expense entries, documenting transactions accurately, and ensuring all required information is included. In addition, do not sign someone else's name, including a customer's name or a colleague's name, "white out" information on corporate records, or backdate anything.
>
> Familiarize yourself with the retention policies and schedules that apply to the Company records in your possession or control. Retain and dispose of Company records according to Boston Scientific's document retention policies. Records involved in litigation or a government investigation may have other document retention requirements. For questions about document retention and classification, contact any of the resources listed at the end of the Code.
>
> We maintain a system of procedures and accounting controls to keep our disclosures accurate and in compliance with applicable legal requirements. You should always follow Company procedures for reporting and disclosing financial information, and cooperate with internal audit processes as requested. For questions about financial records, contact the Corporate Controller.

45. In a section titled "Understanding Stock Trading Rules," the Code of Conduct states, in relevant part:

> If you trade in Boston Scientific stock, take care not to engage in "insider trading." Insider trading means engaging in transactions in a company's securities (for example, buying or selling a company's stock), while aware or in possession of "material nonpublic information" about the company or its securities. When considering whether information is "material nonpublic information," ask yourself questions such as:
>
> - Has the information been released to the public by the Company, or is the information otherwise known generally to the public? If not, it is nonpublic information.
> - Would a reasonable investor consider the information to be important when

> making an investment decision? If yes, it may be material.
>
> • Would public disclosure of the information reasonably be expected to affect the price of Boston Scientific securities? If yes, it may be material.
>
> It is also prohibited to give a "tip" to anyone — including other Boston Scientific employees, family, or friends — to enable trading in Boston Scientific stock based on material nonpublic information.

46. In the section titled "Understanding Consequences," the Code of Conduct states, in relevant part:

> Boston Scientific takes violations of this Code, Company policies and procedures, and applicable laws seriously. Where appropriate, the Company takes prompt corrective action, up to and including termination of employment. Corrective action may also occur for other reasons, including if you:
>
> • Direct others to violate a law, regulation, or Company policies and procedures or applicable laws.
>
> • Know of a violation or potential violation, and fail to report it.
>
> • Fail to effectively monitor the actions of people who work for you.

47. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise their violations of law.

48. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**AUDIT COMMITTEE CHARTER**

49. Boston Scientific also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states that the purpose of the Audit Committee is to:

> [A]ssist it in its oversight of, among other things, (i) the quality and integrity of the Company's financial reporting process, financial statements and related disclosure, (ii) compliance with financial, legal, and regulatory requirements, (iii) selection and retention of the registered public accounting firm of the Company (the "independent auditor"), and evaluation of the independent auditor's qualifications, independence, and performance, (iv) the annual independent audit of the Company's financial statements, and (v) the performance of the Company's internal audit function and financial controls.

50. In a section titled "Authority and Duties," under a subheading titled "Financial Statements and Related Disclosure," the Audit Committee Charter states, in relevant part:

> 9. The Committee shall review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," before the filing of the Company's reports on Form 10-K and Form 10-Q. The Committee shall review management's and the independent auditor's judgment about the quality (not just acceptability) of accounting principles, the reasonableness of significant judgments, and the clarity and the completeness of the financial statements. The Committee shall recommend to the Board whether to include the audited financial statements in the Company's annual report on Form 10-K.
>
> 10. The Committee shall have oversight responsibility for the Company's SEC Reporting Disclosure Committee (Disclosure Committee). The Committee shall receive a report at least quarterly from the Disclosure Committee regarding the proceedings of the Disclosure Committee, including proceedings undertaken and any conclusions reached with respect to the Company's disclosure controls and procedures and internal control over financial reporting for the applicable financial statements and reports to be filed with the SEC.
>
> 11. The Committee shall review with management, the internal auditors and the independent auditor (a) reports, evaluations and recommendations of the independent auditor, including the independent auditor's report on the Company's assessment of internal controls over financial reporting, (b) all critical accounting policies and practices used by the Company in preparing its financial statements, (c) all alternative treatments of financial information within generally accepted accounting principles (GAAP) that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the independent auditor, (d) those critical audit matters (CAMs) arising from the current period audit, as reported in the independent auditor's opinion on the financial statements, (e) any major issues regarding accounting and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, (f) analyses prepared by management and/or

> the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative accounting methods on the financial statements and (g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.
>
> ***
>
> 13. The Committee shall discuss generally and prior to public disclosure the type of information to be disclosed, and the type of presentation to be made, in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as the type of information to be disclosed, and the type of presentation to be made, in any financial information and earnings guidance provided to analysts and rating agencies.
>
> 14. The Committee shall review periodically with management, and any outside professionals as the Committee considers appropriate, important trends and developments in financial reporting practices and requirements and their effect on the Company's financial statements.

51. In the same section, under a subheading titled "Performance of the Internal Audit Function and the Independent Auditor," the Audit Committee Charter states, in relevant part:

> 17. The Committee shall review with management, the internal auditors and the independent auditor the quality, adequacy and effectiveness of the Company's internal controls, including the Company's system to monitor and manage business risk and financial risk exposure to the Company resulting from legal and regulatory compliance matters, and any significant deficiencies or material weaknesses in internal controls.
>
> 18. The Committee shall discuss the Company's guidelines, processes and policies to monitor, assess, evaluate and manage risk.
>
> 19. The Committee shall receive reports on business operations and functions, and other financial reporting and control issues directly from the internal auditors. The Committee shall monitor progress towards correction of any important deficiencies.

52. In the same section, under a subheading titled "Compliance with Legal and Regulatory Requirements," the Audit Committee Charter states, in relevant part:

> 21. The Committee shall assist the Board in its oversight of compliance with financial, legal, and regulatory requirements. The Committee shall have oversight over matters of financial compliance, including financial reporting, internal controls and financial risk exposure to the Company resulting from legal and

> regulatory compliance matters
>
> ***
>
> 24. The Committee shall establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.
>
> 25. The Committee shall oversee administration of and make appropriate recommendations regarding the administration of the Company's Stock Trading Policy, which shall include reviewing the policy on at least an annual basis.

53. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## BOSTON SCIENTIFIC'S RISK, SCIENCE, AND TECHNOLOGY COMMITTEE CHARTER

54. Boston Scientific maintains a Risk, Science, and Technology Committee Charter (the "Risk, Science, and Technology Committee Charter"). The Risk, Science, and Technology Committee Charter states the role of the Risk, Science, and Technology Committee is to, assist in the oversight of Boston Scientific's enterprise-wide approach to risk management, regulatory compliance, the quality and safety of the Company's products, internal and external research and development and innovation initiatives and investments, and the commercialization of technology.

55. In the section titled "Authority and Duties," under a subheading titled "Risk Management," the Risk, Science, and Technology Committee Charter states:

> 1. The Committee shall assist the Board and the Audit Committee in its oversight of the Company's enterprise risk management program.
>
> 2. The Committee shall review and discuss the Company's guidelines, processes and policies to monitor, assess, evaluate and manage non-financial risk.
>
> 3. The Committee shall receive regular reports from the Company's management on matters relating to strategic and operational initiatives, financial performance and legal developments, which are each integrated with enterprise-risk exposures.

56. In the same section, under a subheading titled "Compliance and Quality Oversight," the Risk, Science, and Technology Committee Charter states, in relevant part:

> 1. The Committee shall assist the Board in its oversight of the Company's global compliance program, including matters related to compliance with legal and regulatory requirements as well as compliance with the Company's Code of Conduct (the "Code"). The Committee shall periodically review and, when appropriate, recommend changes to the Code to the Board.

57. In the same section, under a subheading titled "Science and Technology Oversight," the Risk, Science, and Technology Committee Charter states:

> 1. The Committee shall periodically review and assess the Company's science, technology and innovation strategy and priorities, including with respect to capital allocation, organizational structure and the competitive position of the Company's portfolio.
>
> 2. The Committee shall periodically review key programs, processes and organizational structures related to innovation, research and development, clinical trials and commercialization of technology.
>
> 3. The Committee shall stay informed of potentially disruptive science and technology trends, opportunities and risks.

58. In violation of the Risk, Science, and Technology Committee Charter, the Individual Defendants failed to oversee compliance with the Code of Conduct and failed to be informed of disruptive science and technology trends, opportunities, and risks. The Individual

Defendants failed to correct violations of the Code of Conduct and downplayed the impact of new entrants in Boston Scientific's EP segment.

## SUBSTANTIVE ALLEGATIONS

59. Boston Scientific is one the largest manufacturer of medical devices in the world. The Company has an Electrophysiology ("EP") business unit that develops and manufactures products used in the detection and treatment of heart rate and rhythm disorders. The key product offering Boston Scientific provides under this segment is the Farapulse PFA system. Boston Scientific provides EP offerings both in the U.S. and abroad.

***False and Misleading Statements***

60. On July 23, 2025, Boston Scientific reported second quarter 2025 financial results and hosted an earnings call. As part of the press release, Defendant Mahoney stated, in relevant part:

> This was another excellent quarter — marked by exceptional top-line performance — that delivered margin expansion and prioritized investment for future growth. I am incredibly grateful to our dedicated global team for demonstrating clinical and commercial excellence across the company and positioning us for differentiated long-term performance.

61. The release highlighted that management was increasing guidance for fiscal 2025 in order to incorporate updated projections for the Company, including those pertaining to the Electrophysiology ("EP") segment, in relevant part:

> ***The company estimates net sales growth for the full year 2025, versus the prior year period, to be approximately 18 to 19 percent on a reported basis and 14 to 15 percent on an organic basis.*** Full year organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. ***The company estimates EPS on a GAAP basis in a range of $1.89 to $1.93 and estimates adjusted EPS, excluding certain charges (credits), of $2.95 to $2.99.***
>
> The company estimates net sales growth for the third quarter of 2025, versus the prior year period, to be in a range of approximately 17 to 19 percent on a reported

> basis, and 12 to 14 percent on an organic basis. Third quarter organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates EPS on a GAAP basis in a range of $0.44 to $0.46 and estimates adjusted EPS, excluding certain charges (credits), of $0.70 to $0.72.

(Emphasis added).

62. During the earnings call, Defendant Mahoney emphasized Boston Scientific's expectation for continued durable growth in its EP segment, in pertinent part:

> ***In the second half of the year, we expect continued high single-digit growth led by our proprietary technologies and strategic partnerships globally.***
>
> . . .
>
> In the second half, we do expect contribution from our expanded conduction system pacing portfolio in the U.S. and Europe and anticipate FDA approval of the EMPOWER leadless pacemaker by year-end. ***WATCHMAN grew 28% in this quarter, reflecting continued concomitant uptake in the U.S. and the strong safety profile of our latest generation WATCHMAN FLX Pro, which recently received CE Mark. We continue to invest in further in the LAAC market, including the development of our fourth-generation WATCHMAN device, which we anticipate initiating the IDE trial for next year.***
>
> ***We continue to see considerable physician interest in concomitant procedures with over 60% of WATCHMAN implanting EPs in the U.S. having performed a concomitant procedure.*** Recently, we enrolled our first patient in the OPTION-A trial, studying concomitant use of WATCHMAN and FARAPULSE in Asia. We also received expanded labeling for WATCHMAN as a first-line therapy in post-ablation patients in the U.S. following the positive OPTION data, supporting continued confidence in our long-term outlook.
>
> ***Electrophysiology sales grew 94%,*** lapping our first full quarter of the FARAPULSE launch in the U.S. and growing mid-teens sequentially, supported by accelerated placements of the OPA mapping system, our portfolio of access solutions and uptake of concomitant procedures.

(Emphasis added).

63. Defendant Monson then provided his prepared remarks, reiterating the Company's elevated guidance expectations for the remainder of fiscal 2025, in pertinent part, as follows:

> I will now walk through guidance for Q3 and full year 2025. ***We now expect full year 2025 reported revenue growth to be in a range of 18% to 19%*** versus 2024.

> Excluding an approximate 50 basis point tailwind from foreign exchange based on current rates, we expect full year 2025 operational growth to be in the range of 17.5% to 18.5%.
>
> Excluding a 350 basis point contribution from closed acquisitions, we expect full year 2025 organic revenue growth to be in a range of 14% to 15% versus 2024. We expect third quarter 2025 reported revenue growth to be in the range of 17% to 19%. Excluding an approximate 50 basis point tailwind from foreign exchange based on current rates, we expect third quarter 2025 operational growth to be in the range of 16.5% to 18.5%. Excluding an approximate 450 basis point contribution from closed acquisitions, we expect third quarter 2025 organic revenue growth to be in a range of 12% to 14%.
>
> Based on our first half margin performance, ***we now expect to expand full year adjusted operating margin by 75 to 100 basis points while increasing our level of investment in R&D to fuel durable, differentiated revenue growth.*** We now expect full year 2025 adjusted below-the-line expense to be approximately $440 million.

(Emphasis added).

64. A question-and-answer segment followed the Defendants' prepared remarks. Defendants defended their projections, claiming the EP segment would see "continued market growth in the United States," in response to the following pertinent inquiry:

> <Q: Lawrence H. Biegelsen – Wells Fargo Securities, LLC – Senior Medical Device Equity Research Analyst> So for Mike or Dr. Stein, maybe you talked about the growth vectors for your EP business market growth, PFA adoption, new geographies, new products, et cetera. How would you have us think about these pieces and what your EP business could look like in 3 to 5 years? And any color on the proposed ASC codes and what they could mean for you?
>
> <A: Kenneth M. Stein> Yes, Larry, it's -- well, it's a little bit all of the above. And we will get a lot deeper into that, as you say, that long-range plan look at our Investors Day. I think sort of -- again, ***the quick answer beyond it's all of the above is its continued market growth in the United States*** as you look at the safety profile with FARAWAVE, as with the predictability of the case is as you look at the efficacy, accumulating data now actually for superior outcomes compared to thermal ablation.
>
> Very pleased with what we're seeing internationally. Again, as Mike mentioned in the script, over 15,000 cases have already been performed in Japan, where even though we were third to the market, we are already the clear leaders in PFA. Very pleased with the adoption that we're seeing to date of our FARAVIEW process on

OPAL, our FARAWAVE NAV catheter. And you mentioned the ASC, the proposed rule which in the United States from CMS, which would allow ablations to be performed in the ASC, if that's finalized, we see that as an advantage for us. We do think that we are uniquely positioned to take advantage of procedures in the ASC. And again, it gets to the safety, it gets to the predictability, but it also gets to some of the economic advantages using FARAWAVE with FARAVIEW compared to the competition.

65. During a later exchange, Defendants continued to tout the EP segment's growth potential, seeking "to be the #1 overall in EP," and seeing growth that will "still be likely mid-teens growth" even when it starts to slow:

<Q: Matthew Oliver O'Brien – Piper Sandler & Co. – MD & Senior Research Analyst> Maybe I think Mike talked about the concomitant percentage, about 60% of all procedures now or all of your doctors have done at least 1 concomitant procedure. How has that trended over maybe the last 6 to 12 months, especially following the option readout? And then I do have a quick follow-up.

<A: Kenneth M. Stein> Maybe I would -- just to clarify that. ***So the 60% is of the electrophysiologists who do WATCHMAN implants.*** And of course, it's a mix of interventional cardiology, structural heart physicians as well as electrophysiologists who do these procedures. ***But of the EPs who do the procedures who are also the ones who do ablation, right, 60% of EPs who have been WATCHMAN implanters have already jumped on to the concomitant bandwagon.***

***Now I think just in terms of understanding sort of where the growth there is,*** right, remember, although some folks were doing concomitant procedures even before CMS established the unique DRG to pay for it, really, we only have reimbursement at the hospital level for concomitant beginning in October of last year. And then the OPTION data was only released in November of last year. So right, ***this is all still a very new phenomenon,*** and we still see physicians needing to understand how you adopt in the workflow. So sequentially, still seeing important growth in the concomitant in the concomitant procedure.

<Q: Matthew Oliver O'Brien> Okay. Yes, Dr. Stein, I know, we're early days there. I guess the follow-up question would really be kind of dovetailing off of David Roman's question about the breadth of the portfolio that you have here. In mapping now with concomitant with obviously best-in-class product with WATCHMAN by a mile. Just your ability because I know a big concern that investors have is just competition coming in, you've got some established competitors with big mapping footprint out there.

So just your ability to kind of defend yourself or just said another way, the most you're building here between OPAL, all the catheters plus concomitant cases. How

> wide is that moat in your opinion and how much wider can it get?
>
> <A: Michael F. Mahoney> ***Well, we continue to aim to be, as I mentioned, the clear PFA leader, and we aim to be the #1 overall in EP as we widen that portfolio.*** I think a good testament is what happened in Japan. We're 1/3 to market in Japan without a persistent label indication, which our competitors had. And now we're the clear leader in Japan, and we'll be adding persistent label to it.
>
> So we do feel like we have some unique advantages that are highly differentiated with FARAPULSE and Ken detailed out, and you'll see at the Investor Day quite a bit, how we're widening the portfolio for -- and then plus the underlying market growth is nearly 20% right now. ***And clearly, that will slow down over time. But it will still be likely mid-teens growth and the largest, fastest-growing market in med tech . . .***

(Emphasis added).

*<u>September 30, 2025</u>*

66. On September 30, 2025, Defendants conducted their Analys/Investor Day Conference. During the conference, Defendant Fitzgerald highlighted Boston Scientific's confidence in the continued growth trajectory for its EP Segment, in pertinent part:

> I'm going to start with ***our highest growth markets, EP and WATCHMAN.*** So EP, as you know, $13 billion market, largest in medtech and the fastest growing in medtech. ***So we see over the long-range plan, the EP market growing at 15% and Nick and Dr. Sutton will talk about how we're going to outpace the market.*** The basic headline there is we will continue to take share in the broad EP market, and we will enter portions of the EP market that we're not in today, such as ICE, which is a $1 billion market opportunity that we intend to use our SoundCath acquisition to get into. WATCHMAN, very similar to what I talked about in 2023.

(Emphasis added).

67. Later during the call, Defendant Spadea-Anello confidently touted the strength and durability of the EP segment, in pertinent part, as follows:

> I lead the exciting and innovative Electrophysiology business here at Boston Scientific . . . our new vision is not just to be a leader in pulse field ablation, but to be a leader in overall electrophysiology and we aim to do that as fast as we possibly can with what is an all-encompassing EP portfolio that we think is going to be significant to offer.

> . . .
>
> ***We've got an EP market that is meaningfully large and rapidly expanding, and we see strong adoption of PFA. We see that action going from 50% today globally to 80% in 2028 with FARAPULSE.*** We're uniquely positioned to lead and backed by our deep experience and the continued evolution of our PFA catheter portfolio that you saw here today. Our growth is globally diversifying, creating meaningful new revenue opportunities as we expand into large international markets and a decent product segments such as ICE.
>
> In terms of our innovation and ecosystem, ***Boston Scientific is committed to advancing its comprehensive EP offering*** as it integrates all of its FARAPULSE PFA catheters with its OPAL mapping system. ***We think that further strengthens our leadership position.***

(Emphasis added).

68. During the question-and-answer segment of the call, Defendants further discussed the bases for Boston Scientific's continued claimed EP segment growth, in pertinent part, as follows:

> <Q: Lawrence H. Biegelsen – Wells Fargo Securities, LLC – Senior Medical Device Equity Research Analyst> I think arguably, one of the biggest concerns investors have is your share within the PFA ablation catheter segment as competition increases. Where do you think your share of PFA is today? What are you assuming for your PFA share over the LRP? And your slide said you aim to be the EP market leader. Do you expect to get there by 2028?
>
> <A: Nicholas Spadea-Anello> A couple of things. So first of all, we don't share details -- specific details on market share. But I hope that seeing the number of patients we've been able to serve and the portfolio that we have, today's workhorse catheter is the fairway of catheter. And the simplicity of it, the versatility of it to do multiple lesions, whether it's PVI, posterior wall and persistent or paroxysmal patients. ***We think as we evolve that even further with all the mapping capabilities integrated and the portfolio to offer other tools, we can do a lot of things there that continues this growth journey into the foreseeable future. We feel very confident about that.***
>
> And you're going to see other strategics. The good thing is that we were first with PFA. And while other strategics had other energy modalities that they did very well in, they came a little bit later. And that waveform in our catheters today, the engineering behind that is meaningfully different and in every one of those

catheters. ***So as we move forward, we feel very confident that we can continue to do well.***

. . .

<Q: Danielle Joy Antalffy – UBS Investment Bank – Analyst> Danielle Antalffy from UBS. Just a question on the market growth given for the EP business, but also WATCHMAN and just thinking about the concomitant procedure, but also separately, I mean, what is the rate limiting factor? Because you look at the TAM numbers and growth feels like it could be even faster and more aggressive than what you guys are laying out there. So curious about how you're thinking about capacity ramping to take in all these patients, but also things like pricing as this becomes a bigger ticket item for hospitals.

<A: Nicholas Spadea-Anello> . . . So first of all, a lot of cath labs or hospitals are expanding the number of cath labs in their AF centers today. So we're seeing that happen in a lot of big centers to really fuel that. But we also see site of service with these ASCs that are going to start up. And to Joe's point, we have that flexibility. ***When we introduced pulse field ablation with FARAPULSE, we see the average cath lab doing 30-plus percent more. And that's not all of the operators that are getting trained today to be able to do these procedures.***

So as we expand and we go deeper and we introduce this to more centers around the world, we continue to see that. ***So it's dynamic, Danielle, but we see a lot of new growth just in the introduction to new centers and cath lab capacity expanding as well as ASCs opening.***

. . .

<Q: Anthony Charles Petrone – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst of Medical Devices, Diagnostics, and Therapeutics> Anthony Petrone, Mizuho. Lazania comment, by the way, was great. Maybe a little bit on the competitive landscape in EP when you think of complex cases versus single-shot cases. There's a little bit of noise out there that, that competition may be gaining in complex cases. So maybe a little bit on that and the competitive response in complex versus simple cases. And then renal denervation, you quote $1 billion opportunity. Can you go through really the target in that uncontrolled hypertension market? What is the blood pressure measure and the medication utilization intensity in that $1 billion?

<A: Nicholas Spadea-Anello> . . . ***Right now, our play with complex procedures, which is a smaller segment of the PFA market today, it will grow over the course of the next several years.*** The vast majority of the market is going to be PVI and posterior wall. And that's going to be in paroxysmal and persistent patients with the tools that we have that will evolve. ***But as you look at the complex opportunity, we've got FARAFLEX that we think is going to really revolutionize the experience to go after complex arrhythmia.***

As I've mentioned in my presentation, the ability to have customizable lesions with monopolar and bipolar to get deeper where you need to go deeper. Other wide area form factors that are out in the market today were born as RF catheters. And PF was placed on them because the movement was happening so fast, and that would have missed a tremendous opportunity. We build a ground-up PFA catheter for complex in BT to give you deeper lesions. ***And so we're going to corner that market. We also have, call it, more challenging cases, Cortex that you heard from Dr. Brad Sutton. So we've got a suite of offerings that makes us really competitive, not just in the workhorse area of the market, but also the complex areas.***

. . .

<Q: Matthew Oliver O'Brien – Piper Sandler & Co. – MD & Senior Research Analyst> Matt O'Brien, Piper Sandler. I kind of want to circle back to what Larry started off with on the share dynamic in EP because by my numbers, you're about ***75%, 80% share of PFA at this point. I can think back to -- although there's two of you in the space now essentially at this point, right, you guys and Medtronic.*** I can think back to other categories like DES and CRM, where you've seen a lot of variability in share over time. What makes it different for you guys with PFA and your portfolio this time where you can insulate yourself and keep that share versus what we've seen with some pretty big share movements in other areas of cardio historically?

<A: Nicholas Spadea-Anello> It's a great question. ***And again, we're not going to be respectfully specific on share. But what's different about this is the ecosystem, and you saw that slide. The ecosystem starts to take, call it, PFA today that is going to have mapping capabilities and some of the things that I talked about that will be exclusive and unique to us.***

***The FARAWAVE catheter, third generation with all those electrodes, you won't be able to get all those features and capabilities unless you have an open mapping system that ties that together.*** ICE, which Dr. Sutton spoke about, which is a new opportunity with AI. As you think about the evolution and the cadence of the launch of ICE, that will all be integrated into our mapping system. You'll also have Cortex. We'll see how that plays out. We're very optimistic about that. That will be integrated.

***So we're insulating ourselves by having an entire ecosystem tied to our mapping system.*** And we know that the hard way because we lost when it came to RF and tying it together. We learned the hard way when it comes to now having a new energy modality where we're leading and leading big to capitalize on that and capitalize on that in a big way. That's how I'd answer that question.

(Emphasis added).

<u>*October 22, 2025*</u>

69. On October 22, 2025, Defendants issued a release debuting their third quarter results as follows:

> [The Company] generated net sales of $5.065 billion during the third quarter of 2025, growing 20.3 percent on a reported basis, 19.4 percent on an operational basis and 15.3 percent on an organic basis, all compared to the prior year period. The company reported GAAP net income attributable to Boston Scientific common stockholders of $755 million or $0.51 per share (EPS), compared to $469 million or $0.32 per share a year ago, and achieved adjusted EPS of $0.75 for the period, compared to $0.63 a year ago.

70. Defendant Mahoney was quoted on the release, touting Boston Scientific's "exceptional quarter of strong performance across businesses and regions," and confidently asserted that, "[a]s we shared at our recent investor Day meeting, we are well-positioned for differentiated growth that is fueled by our category leadership strategy, relentless focus on innovation and commitment to scaling capabilities."

71. Pertinently, the release further highlighted that management had yet again elevated Boston Scientific's full year 2025 guidance alongside the issuance of guidance for the fourth quarter, as follows:

> The company ***estimates net sales growth*** for the full year 2025, versus the prior year period, t***o be approximately 20 percent*** on a reported basis and approximately 15.5 percent on an organic basis. Full year organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. ***The company estimates EPS on a GAAP basis in a range of $1.97 to $2.01*** and estimates adjusted EPS, excluding certain charges (credits), of $3.02 to $3.04
>
> The company estimates net sales growth for the fourth quarter of 2025, versus the prior year period, to be in a range of approximately 14.5 to 16.5 percent on a reported basis, and 11 to 13 percent on an organic basis. Fourth quarter organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates EPS on a GAAP basis in a range of $0.48 to $0.52 and estimates adjusted EPS, excluding certain charges

(credits), of $0.77 to $0.79.

(Emphasis added)

72. An earnings call was conducted following Boston Scientific's release. During the earnings call, Defendant Mahoney highlighted the growth of the Company's U.S. EP segment as follows, in pertinent part

> I'll now provide some additional highlights on our third quarter results and outlook. ***Regionally, on an operational basis, the U.S. grew 27% with an impressive growth. The excellent growth is broad-based across our Cardiovascular businesses, Endoscopy and Neuromodulation.***
>
> . . .
>
> ***WATCHMAN grew an outstanding 35% this quarter and surpassed 600,000 patients targeted to date. The excellent growth in the quarter reflects accelerated concomitant uptake in the U.S.*** and continued penetration into the 5 million patients indicated today through excellent clinical results and strong patient and physician awareness. W***e continue to expect approximately 25% of the U.S. WATCHMAN procedures to be done concomitantly exiting '25 with a potential for that to double by 2028, enabled by the trusted FARAWATCH approach.*** We are ***confident that we can continue to grow the WATCHMAN market by approximately 20% for the years to come*** driven by continued concomitant uptake, the upcoming data presentation of CHAMPION in the first half of '26 and the launch of our next-generation device, WATCHMAN Elite, expected in late '27 or early '28.
>
> ***Turning to EP. We're incredibly proud of our EP performance, with third quarter sales growing 63% as we drive continued share gains in the overall EP market.*** FARAPULSE remains the leading PFA technology having treated over 500,000 patients to date with consistent and reproducible real-world results, further demonstrated in the recently published 1-year results from the FARADISE trial, which showed favorable procedural and safety outcomes and clinical effectiveness across ablation strategies and AF types.
>
> ***In the U.S., we saw continued strong double-digit growth in FARAPULSE*** supported by ramping adoption of our OPAL HDx mapping system, with 1 in 3 FARAPULSE accounts now utilizing our integrated FARAWAVE NAV and OPAL device. ***The team is executing our pipeline strategy, and we recently launched our contact sensing feature and are moving to full release this month.***

(Emphasis added).

73. Defendant Mahoney further articulated Boston Scientific's expectations for

continued growth in the U.S. EP segment, pertinently, as follows:

> ***Looking forward, our aim is to grow -- continue to grow our share in the overall EP market, and we expect to retain a strong leadership position in PFA,*** enabled by our innovative portfolio, expanding mapping and commercial resources and consistent data publications. ***We expect global PFA penetration to continue to expand and to exit 2025 at 50% penetration and grow to approximately 80% by 2028.***
>
> . . .
>
> ***By year-end '25, we expect to make meaningful progress towards expanding access to new technologies in more complex and redo patients with the launch of our FARAPOINT PFA catheter as well as initiating enrollment in the OPTIMIZE trial, which will study the integration of OPAL in the Cortex AI algorithm.*** Cortex is a differentiated mapping software designed to precisely visualize and target sources of arrhythmias, addressing an unmet need in the treatment of persistent AF patients with unexplained reoccurrence.
>
> ***In closing, I look forward to finishing out an outstanding 2025 and delivering on our guidance, which will result in another year of delivering highly differentiated financial results versus our peer group.***

(Emphasis added).

74. Defendant Monson added to the discussion, providing specific financial targets for the Company's guidance, in pertinent part, as follows:

> I'll now walk through guidance for Q4 and full year 2025. We expect full year 2025 reported revenue growth of approximately 20%. Excluding an approximate 100 basis point tailwind from foreign exchange, we expect full year 2025 operational revenue growth of approximately 19%. Excluding an approximate 350 basis point contribution from closed acquisitions, we expect full year 2025 organic revenue growth of approximately 15.5% versus 2024.
>
> We expect fourth quarter 2025 reported revenue growth to be in the range of 14.5% to 16.5%. Excluding an approximate 200 basis point tailwind from foreign exchange, we expect operational growth to be in a range of 12.5% to 14.5%, and excluding an approximate 150 basis point contribution from closed acquisitions, we expect fourth quarter 2025 organic revenue growth to be in a range of 11% to 13% versus 2024.
>
> ***As a result of our year-to-date margin performance, we now expect to expand full year adjusted operating margin by approximately 100 basis points at the high end***

> ***of our prior range of 75 to 100 basis points, and we continue to expect full year 2025 adjusted below-the-line expense to be approximately $440 million.*** We also maintain our forecast for a full year adjusted tax rate of approximately 12.5% and an operational tax rate of approximately 14%. We expect full year adjusted earnings per share to be in the range of $3.02 to $3.04, representing growth of 20% to 21% versus 2024. We continue to expect an approximate $0.04 foreign exchange headwind on full year adjusted earnings per share. And for Q4, we expect adjusted earnings per share to be in a range of $0.77 to $0.79.
>
> In closing, ***I'm pleased with our strong third quarter financial performance and look forward to executing on our full year 2025 guidance and our long-range financial goals, which we shared at our recent Investor Day.*** From 2026 to 2028, we're targeting 10% plus average organic revenue growth, approximately 50 basis points of annual adjusted operating margin expansion, leveraged double-digit adjusted earnings per share growth and 70% to 80% annual free cash flow conversion. We feel that these goals represent differentiated performance in medtech, and we look forward to executing on them.

(Emphasis added).

75. During the question-and-answer segment that followed, Defendants discussed their projections and more broadly the future of U.S. EP in response to the following pertinent questions:

> <Q: David Harrison Roman – Goldman Sachs Group, Inc. – Research Analyst> Mike, you referenced this in response to one of the earlier questions, but I was hoping you could expand on the dynamics in the business, kind of outside EP and WATCHMAN, there's obviously a disproportionate focus on those businesses given how strong a growth contribution they've been. But as we look forward, I think everyone understands that the EP business is going to decelerate given just the size and the competitive landscape there, even with strong market growth. But if you look across the rest of the portfolio, you're seeing good momentum in businesses like Neuromodulation and Endoscopy. You talked about some of the improvements you're seeing in Silk Road. But maybe help frame for us what are kind of the drivers that support the growth outlook in the rest of the business? And where you think from a product perspective, we should be focused?
>
> <A: Michael F. Mahoney> . . . So much of the attention goes to ***our EP business and it should, given that we were just #4, now we're a clear #2 and have higher aim over the future.*** But as you said, ***it's not going to grow as fast as it has given that we're anniversarying comps and the size of the business, but we expect it to be an outstanding performer in '26 and beyond in our EP business.*** But I'm really proud of the rest of the divisions. And not every one of our business grows faster than market every quarter. But as a composite, we clearly do. And that's what we indicated at our Investor Day to grow faster than our 9% WAMGR.

. . .

<Q: Philip Chickering – Deutsche Bank AG – Research Analyst> A question about the proposed reimbursement for AF ablation and ASCs for next year. What proportion of AF ablations do you think could be moved into the ASCs? And how could the increased capacity using ASCs help fuel additional market growth?

. . .

<A: Michael F. Mahoney> . . . But I just think broadly on EP, we're still remarkably early in the PFA journey, given our launch, what, 18 months ago, Ken, or whatever, less than 2 years ago, I guess.

. . .

Yes. And ***so the key for us is we continue to drive new account openings around the globe. We still have a lot of work to do with new account openings in the U.S. and particularly in Asia Pac.*** And the new account openings help drive penetration. ***We also have the opportunity to continue to grow deeper with more physicians leveraging FARAPULSE. We also have the opportunity with our unique position with concomitant to train more electrophysiologists to do WATCHMAN.*** So we still have a number of EPs out there that are not doing LAC procedures and with the impact of concomitant, we are seeing an uptick in the number of physicians who want to be trained in LAC. So that ecosystem of still early innings in PFA globally, the momentum of concomitant, the demand from physicians to learn and train on WATCHMAN now to serve that need will continue to help us, which is why the ASCs are important because we do need the ASCs over time to help with the volume demands that we're seeing across these markets.

(Emphasis added).

*December 2, 2025*

76. On December 2, 2025, Defendant Fitzgerald sat for a Q&A with Citigroup's Joanne Karen Wuensch during the Citi Annual Global Healthcare Conference 2025 and had the following pertinent exchanges discussing the U.S. EP segment's continued growth and dismissing the potential of any significant competitive headwinds:

<Q: Joanne Karen Wuensch – Citigroup Inc. – Managing Director>Excellent. Well, that just leads us straight into electrophysiology. And you have a few things going on in that area. Would you like to give us a state of the union?

<A: Joseph M. Fitzgerald> ***Sure. The EP business*** . . . we're ***growing, as you've seen in our numbers to date, probably 2x the market, driven by the ecosystem that***

> ***is everything around FARAPULSE.*** So that is the FARAWAVE catheter, the approvals we've gotten for both PVI and PVI posterior wall said another way, both paroxysmal and persistent indications, as well as the integration of FARAWAVE into our OPAL Mapping System, which we commonly refer to FARANAV. There's a bigger ecosystem that I'm sure we'll get into.
>
> But as an example, if you look at PFA cases around the globe, it's not uncommon for other catheters to be pulled to do other complex ablations, touchups, et cetera. And just recently, I think we posted yesterday, we got approval in the EU for our FARAPOINT catheter. So as we've said, we have pending FDA approval for that catheter, and it's great to bring the CE Mark in. And that just -- that's one small example of how our ecosystem around the FARAPULSE system will continue to increase over the next few years.
>
> . . .
>
> <Q: Joanne Karen Wuensch> And from in EP, we'll stick with that for now. How do you think about the changing competitive landscape? There will be a new market participant in the United States next year?
>
> <A: Joseph M. Fitzgerald> ***Yes. I mean, surprise, surprise, everything in cardiology has multiple competitors, and it's highly competitive. That's -- it's been that same way for the 35 years I've been in cardio. So that's kind of par for the course, right?*** So we have -- the good news in a PMA-driven market is you tend not to get surprised. So you can see what's happening in the CE Mark trials. You can see what's happening in IDE approval studies in the U.S. So suffice it to say, ***I think we have a very good understanding of what competition we will face and in what time frame.*** And so I can't do much about that other than make sure that our ecosystem, the 3 catheters that you talked about, the OPAL Mapping System, the OPAL Mapping Capacity, those are the things directly in our control that we remain super focused on.

(Emphasis added).

*January 13, 2026*

77. Defendant Mahoney continued the positivity during the 44th Annual JPM Healthcare Conference on January 13, 2026, stating, in pertinent part:

> ***. . . I think we're blessed to have, I think, the 2 most differentiated products in med tech with WATCHMAN that has a 91% share and FARAPULSE,*** we talked about the last 25 minutes. So we -- ***and then maybe the fastest-growing procedure, if you look at the fast-growing markets, EP, the WATCHMAN market actually grows faster, but not quite the size of it and then concomitant.*** And we're blessed to have 2 really unique products there that our doctors are so comfortable with.

> And the OPTION data, the reimbursement has put a big tailwind behind that concomitant procedure that really only Boston Scientific can deliver uniquely and safely. ***And we estimate, I think, at Investor Day, about 25% of the WATCHMAN patients are being used in a concomitant procedure. We think that number can grow at least to 50, if not north of 50.*** And Ken can talk about OPTION and CHAMPION, really important readout in a couple of months here.
>
> So the concomitant procedure is so efficient. It's very safe. It's economical. Hospitals enjoy the reimbursement benefit. ***We have an excellent clinical team that's very, very difficult to match to do both of those procedures. And referring physicians are very, very comfortable with it. So we continue to see that as a big tailwind for Boston Scientific.***

(Emphasis added)

78. The above statements in Paragraphs 53 to 70 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risk from seasonality and macroeconomic fluctuations. In truth, Boston Scientific's ambition of continuing "to grow our share in the overall EP market" to maintain a growth trajectory at "2x the market" had fallen short of reality; the Company had begun to experience new competition entrants that were sapping Boston Scientific's U.S. Electrophysiology market share and thus limiting the Company's growth potential.

***The Truth Emerges during Boston Scientific's Fourth Quarter Earnings Report***

*February 4, 2026*

79. On February 4, 2026, before market open, Boston Scientific published a press release announcing fourth quarter and full year 2025 results that fell shy of the company's previously issued guidance. In pertinent part, the release highlighted the results as follows: and issued 2026 guidance. In pertinent part:

> Boston Scientific [] generated net sales of $5.286 billion during the fourth quarter of 2025, growing 15.9 percent on a reported basis, 14.3 percent on an operational

> basis and 12.7 percent on an organic basis, all compared to the prior year period. ***The company reported GAAP net income attributable to Boston Scientific common stockholders of $672 million or $0.45 per share (EPS)***, compared to $566 million or $0.38 per share a year ago, and achieved adjusted EPS of $0.80 for the period, compared to $0.70 a year ago.
>
> For the full year 2025, the company generated ***net sales of $20.074 billion, growing 19.9 percent on a reported basis,*** 19.2 percent on an operational basis and 15.8 percent on an organic basis, all compared to the prior year period. ***The company reported GAAP net income attributable to Boston Scientific common stockholders of $2.898 billion or $1.94 per share,*** compared to $1.853 billion or $1.25 per share a year ago, and delivered full year adjusted EPS of $3.06, compared to $2.51 a year ago.
>
> . . .
>
> ***Reported GAAP net income attributable to Boston Scientific common stockholders of $0.45 per share, compared to the company's guidance range of $0.48 to $0.52 per share,*** and achieved adjusted EPS of $0.80 per share, compared to the guidance range of $0.77 to $0.79 per share.

(Emphasis added).

80. The release further provided guidance for the first quarter and full year 2026 which similarly fell below analysts growth expectations for Boston Scientific, in pertinent part:

> The company estimates net sales growth for the full year 2026, versus the prior year period, to be approximately 10.5 to 11.5 percent on a reported basis and 10.0 to 11.0 percent on an organic basis. Full year organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates adjusted EPS, excluding certain charges (credits), of $3.43 to $3.49.
>
> The company estimates net sales growth for the first quarter of 2026, versus the prior year period, to be approximately 10.5 to 12.0 percent on a reported basis and 8.5 to 10.0 percent on an organic basis. First quarter organic net sales guidance excludes the impact of foreign currency fluctuations and net sales attributable to certain acquisitions and divestitures for which there are less than a full period of comparable net sales. The company estimates adjusted EPS, excluding certain charges (credits), of $0.78 to $0.80.

81. During the Q&A, the company received a flurry of questions related to surprising weakness in U.S. EP performance, for example, during the following exchange:

<Q: Robert Justin Marcus – JPMorgan Chase & Co. – Analyst> I'll ask the question that's on everybody's mind today. Mike, there were fears that U.S. EP and U.S. WATCHMAN could come in soft, and U.S. EP was flat with third quarter. U.S. WATCHMAN missed by a hair. What exactly happened in the quarter versus your expectations versus the market? And the reason people are concerned is these are 2 of the key growth drivers. So you talked about confidence in above 15% EP growth next year of the market. The Street is sitting at around 25%. It feels like that needs to come down. Hopefully, you could help us level set expectations for those 2 key products, what happened in the quarter and how to think about them in '26?

<A: Michael F. Mahoney> Well, thank you, Robbie. Happy to. And I'll touch on your question. Overall, we're super pleased with the quarter and the full year growing 16%, EPS growing 22% for the full year and 6 of our 8 business divisions growing faster than the market -- growing faster than the WAMGR and setting us up for strong guide and investments for the overall company. The 2 businesses that you called out, I think you nailed it. If you look at EP, we're quite pleased. Actually, our results in Q4 exceeded our internal target. And WATCHMAN grew 29%, pretty much similar to the third quarter, as we lap the anniversary of the concomitant reimbursement a year ago.

Specific to EP, really pleased with the results of 35%. Two of our larger competitors resulted -- had results of 6.5% growth, the market leader. Third place player 12.5%. We grew 35%. So we continue to gain share overall. And ***to your point, we think the market in Q4 was closer to 18% to 20% growth rather than what some other companies have claimed at 25%. So we think the market was kind of in an 18% to 20% range, similar to what we developed internally in our plan.*** And we've called the market for 2026 about 15% growth. So we think it's an excellent market. We don't think it grew 25% in the fourth quarter. ***We grew faster than our peer group based on this percentage that I saw or that we laid out.*** We actually grew even faster outside the U.S. than the U.S.

The U.S. is more highly penetrated with PFA. There's actually more competitors present outside the U.S., and we've accelerated growth outside the U.S. ***So our PFA performance is quite strong. The market is still healthy. We think it's 18% to 20% in the fourth quarter. And we exceeded our internal plan, and we got new products approved. Our mapping footprint continues to grow, and we have a lot of clinical data that -- various clinical studies that are in flight. So we're very confident with our PFA business and our performance.***

With WATCHMAN, we grew 29%, excellent job. We pretty much are the market with WATCHMAN. Concomitant continues to grow, and we did annualize the concomitant reimbursement, which happened in fourth quarter last year. So we're quite proud of the 29%. When you come to these consensus numbers, we exceeded our guidance. We actually exceeded analyst consensus. ***The mix of that is slightly different, but it shows the power of all of Boston Scientific being able to deliver, to beat our guidance,*** to beat consensus in the quarter and the full year. And we're

quite proud of the EP performance based on the commentary I just provided.

. . .

<Q: Travis Lee Steed – BofA Securities – Managing Director> I guess I want to push a little more on U.S. EP just because it was flat sequentially and your RF competitors grew $18 million and $26 million sequentially in the U.S. So it does look like share change versus last quarter at least on a sequential basis. And I don't know if there was something that changed late in the quarter because you were pretty bullish at some December meetings with investors. And so I don't know if there's anything kind of changed at the end of the quarter and especially considering the Q1 guide of 8.5% to 10% and kind of what that means for EP in the early part of '26.

<A: Michael F. Mahoney> I think we've been pretty consistent with our messaging on EP. We do think the market is 18% to 20%, like we said, ***I think some maybe have overshot the market growth in Q4. When you're the highest market share leader in PFA and competitors are coming out, we planned and we do expect to lose some share given the competitive launches that are coming out and given our really dominant market share position going into 2025***. So we did anticipate that. And we are also very comfortable to say that as we looked at the end of '26, that we'll be the clear PFA market leader with growing -- and we also think our EP business grow faster than 15%.

***So with new entrants coming, it's not surprising that we lost some share.*** But the overall EP growth of 35%, I think, is quite impressive given the size of that business now and grew faster overall than our competitors. ***On the first quarter guide, we guided full year to 10% to 11%, which we think is strong guidance for the -- given where we are early in the year here. And 8.5% to 10%, it's simply 2 factors really, one is our toughest comp of the year. And secondly, we do have the -- about 150 bps of impact from the ACURATE discontinuation along with the AXIOS withdrawal, well, not full withdrawal, but partial matrix withdrawal, which will impact the first half of the year.***

So we see both those products -- both those issues will be addressed as you get into, call it, June for the second half of the year with the impact of ACURATE being gone, AXIOS being gone, our product launches and slightly easier comps, although it's still tough, but slightly easier in the first quarter.

. . .

<Q: Frederick Allen Wise – Stifel, Nicolaus & Company, Inc. – MD & Senior Equity Research Analyst> I hate to stick with EP, but looking at the EP discussion from another angle, maybe talk us through your expectations for how the '25 (sic) [ '26 ] year is going to unfold, maybe the cadence of the year, specifically relating to better understanding the growth acceleration that seems likely to occur as the quarters progress, helped by your innovation pipeline. And so maybe you can drill

down further into what are the implications of FARAPOINT and talk to us again about the ancillary products like ICE catheter, et cetera. And maybe any updates on the FARAFLEX timing. So we better understand how -- again, the cadence of '25 and the setup as we head into -- I'm sorry, for '26 and the setup for '27.

<A: Michael F. Mahoney> ***Sure. I guess as we exit '25, we're kind of in a, what, 65-ish percent PFA market share position. We have a market that we think is going to grow 15%. We have high utilization in the U.S., call it, 80% -- 70%, 80% and outside the U.S., quite a bit lower. So with a healthy market, we expect to continue to grow above market.*** Our PFA share will reduce somewhat, but we're very confident by year-end, likely if you add all the other competitors together, our share will be equal to them or in that area. We're not going to break out share by quarter, but we're very confident that we'll maintain clear market leadership in PFA over the course of 2026 and beyond.

And I think if you look at the drivers that continue the strong pace of growth overall, one, it's geographic scope. We continue to gain share in Japan. We just got a persistent indication. We continue to drive more account openings, utilization in Japan. China is a very, very big market, a small part of our number. We made significant investments in the past 18 months in China, and you'll see China have a more significant impact on our overall global growth.

Europe is the most competitive market, but our growth rate is quite impressive there, and we just got approval for the FARAPOINT catheter. ***In the U.S., same thing, now more significant mapping -- scaled mapping commercial team continues to gain experience, continues to add more mappers, more OPAL systems. The FARAPOINT product will allow us more time in the lab to expand our reach in different clinical indications. And we have a host of products in the pipeline.*** You mentioned a few of them. They won't impact 2026 in a meaningful way. But we will continue to widen out the portfolio with our Cortex clinical trial work being done, the recent FARAPOINT approval. And then we have a whole cadence of new catheters coming over the coming 1 to 3 years. So we have significant investments in the portfolio, and we continue to expect to be the clear market leader and have a very strong '26 growing faster than market.

. . .

<Q: Danielle Joy Antalffy – UBS Investment Bank – Analyst> And Mike, sorry, this is another EP, WATCHMAN question. And maybe it's actually for Dr. Stein though. I mean, I guess I'm curious, as you see competitors launch, I know you guys talked about like pretty significant efficiency gains with FARAPULSE and PFA devices overall. Those are probably slowing. We have WATCHMAN coming. I mean I asked this at the Analyst Day, but I'm just curious what's playing out in the real world as far as capacity at the EP lab because a lot of the docs we talk to sound like they have growing waitlist for their EP procedures, and this could only just get exacerbated once CHAMPION comes, assuming CHAMPION is positive.

> So I'm just curious what you could say to that and how much that is currently impacting overall market growth.
>
> <A: Kenneth M. Stein> Yes, Danielle. I mean I think you nailed it, right? ***I mean we've now anniversaried -- I mean we're 3 years into the launch of FARAPULSE in the U.S. I think the efficiency gains that people saw are largely now built into the system.*** And I think as Mike said, that's why what we're looking for, again, is 15% growth in the EP market next year. ***Again, we are growing and believe we will continue to grow faster than that market. But the keys -- again, feel a little sort of almost silly that I'm apologizing for 15% growth in what's one of the largest markets in med tech.***
>
> But the keys to driving that forward will be, A, starting the build-out of ASCs in the United States to unlock some more capacity and reduce those waiting lists, continued just development and repurposing cath labs for the use for EP procedures in the hospital, continuing what we can do as a company to help further drive greater efficiency in procedures. So things that we can do with concomitant procedures, just growth of concomitant overall helps with that efficiency. We've talked about some of the other investments that we've made, the partnership with Siemens on 4D ICE. ***But really, until all of those things play out, that's why we really don't see growth exceeding 20% in the market and why that 15% seems to us to be a much more realistic way to view it. But again, to close, but it is our intent to continue to grow faster than that market.***

(Emphasis added)

82. The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the July 23, September 30, October 22, December 2, 2025, and January 13, 2026 earnings and shareholder calls. During those presentations, Defendants continually raised associated fiscal 2025 guidance targets, claiming heightened confidence in the U.S. EP division's growth trajectory, while continually minimizing risks associated with competition, seasonality and the potential impact of the macro environment on the pharmacy division's future profitability.

83. Investors and analysts reacted immediately to Boston Scientific's revelation. The price of Boston Scientific's common stock declined dramatically. From a closing market price of $91.62 per share on February 3, 2026, Boston Scientific's stock price fell to $75.50 per share on

February 4, 2026, a decline of about 17.6% in the span of just a single day.

84. A number of well-known analysts who had been following Boston Scientific lowered their price targets in response to Boston Scientific's disclosures. For example, Raymond James, while slashing their price target more than 21% highlighted the source of investor disappointment, in pertinent part:

> the ***deceleration in BSX's U.S. EP franchise was steeper than we expected.*** While we expected EP growth to decelerate, off of unsustainable levels, ***it came earlier than we had modeled.***
>
> . . .
>
> ***4Q was optically fine, but both the U.S. EP and U.S. WM numbers missed consensus.*** These two products account for 26% of sales but contributed over half of BSX's growth in 2025. We lowered our estimates for these products for the first time in five quarters. With lower EP and WM growth, there is less room for upside.

(Emphasis added).

85. Similarly, Barclays highlighted that the "sharp drop in the stock" was triggered by "Q4 U.S. EP sales [coming] up short of consensus." The analyst highlighted that "EP was up 35%, but $35 mil below consensus." Pertinently, the Analyst went on to assess investors disappointment with regard to Boston Scientific's fiscal 2026 projections, noting the following:

> Mgmt guided 2026 organic sales growth guidance from 10.0 – 11.0%, below consensus of 11.4% and in line with our below-consensus estimate of 10.6%. Mgmt also guided FY26 EPS of $3.43 – 3.49, bracketing cons of $3.47 and our prior estimate of $3.45. For Q1, ***mgmt expects organic sales growth of 8.5-10.0% (below cons of 10.3% and our estimate of 10.5%)***, and EPS of 0.78-0.80c, in-line with ours and consensus estimate of 80c

(Emphasis added)

86. Additionally, Evercore removed BSX from its "TAP OP (tactical, actionable, positioning) list," highlighting the disappointment as follows:

> BSX – Did not work: We were wrong...we had thought that US EP revs would be fine & International EP would Beat on share gains. **EP missed and drove one of**

**the single largest declines on growth slowdown fears.**

(Emphasis added).

87. The fact that these analysts, and others, discussed the sudden rapid deceleration of Boston Scientific's U.S. EP franchise alongside below-expectation performance and projections for the segment suggests the public placed significant weight on Boston Scientific's prior revenue and growth estimates. The frequent, in-depth discussion of the performance Boston Scientific's U.S. EP segment confirms that Defendants' statements during the Class Period were material.

## HARM TO THE COMPANY

88. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred substantial financial losses, including but not limited to the costs of defending and potentially incurring class wide liability in the Securities Class Action, the costs of defending government investigations, as well as additional losses, including reputational harm and loss of goodwill.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

89. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

90. Boston Scientific is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

91. Plaintiff is a current shareholder of Boston Scientific and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation. A

pre-suit demand on the Board of Boston Scientific is futile and, therefore, excused. During the illegal and wrongful course of conduct at the Company and to the present, the twelve-person Board consisted of Individual Defendants Mahoney, Fujimori, Habiger, Mega, Morano, Ludwig, Pegus, Sununu, Wichmann, Zane (the "Director-Defendants") and non-parties Cathy R. Smith and Christophe P. Weber (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors who are on the Board at the time this action has commenced.

92. Given the factual allegations set forth herein, Plaintiff has not made a demand on the Board to bring this action against the Individual Defendants. A pre-suit demand on the Board would be futile as there is reason to doubt that a majority of the members of the Board is capable of making an independent and/or disinterested decision to initiate and vigorously pursue this action. As set forth herein, Plaintiff has adequately alleged that there is reason to doubt that all of the current directors of Boston Scientific, and in particular the Director Defendants, are capable of disinterestedly and independently considering a demand to initiate and vigorously prosecute this action.

93. The Director Defendants either knew or should have known of the false and materially misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

94. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

95. Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

96. The Director-Defendants caused Boston Scientific to issue false and misleading statements which were intended to make Boston Scientific appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

97. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members, the Director Defendants knew, or should have known, the material facts surrounding the realities of the Company's business.

98. The Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures, and failed to make a good faith effort to correct the problems or prevent their

recurrence.

99. Additional reasons that demand on Defendant Mahoney is futile follow. Defendant Mahoney has served as the Company's President since October 2011, its CEO and a Company director since 2012, and as the Company's Chairman since May 2016. The Company provides Defendant Mahoney with his principal occupation. Thus, as the Company admits, he is not independent. As a Company director and the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Moreover, his insider sales made while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. Defendant Mahoney is also named as a defendant in the Securities Class Action.

100. Additional reasons that demand on Defendant Fujimori is futile to follow. Defendant Fujimori has served as a Company director since July 2016. He also served as the Chair of the Risk, Science, and Technology Committee at all relevant times. Defendant Fujimori received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sale made while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein

further demonstrate his motive in participating in the fraud.

101. Additional reasons that demand on Defendant Habiger is futile to follow. Defendant Habiger has served as a Company director since July 2024. He also serves as a member of the Audit Committee and the Executive Compensation and Human Resources Committee. Defendant Habiger received and continues to receive handsome compensation for his role as a Company director. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

102. Additional reasons that demand on Defendant Ludwig is futile to follow. Defendant Ludwig has served as a Company director since March 2014 and as Lead Independent Director since May 2016. He also serves as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Ludwig received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sale made while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud.

103. Additional reasons that demand on Defendant Mega is futile to follow. Defendant Mega has served as a Company director since June 2023. She also serves as a member of the Executive Compensation and Human Resources Committee and the Risk, Science, and

Technology Committee. Defendant Mega received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

104. Additional reasons that demand on Defendant Morano is futile follow. Defendant Morano has served as a Company director since June 2023. She also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee. Defendant Morano received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

105. Additional reasons that demand on Defendant Pegus is futile to follow. Defendant Pegus has served as a Company director since May 2024. She also serves as the current Chair of the Risk, Science, and Technology Committee and as a member of the Executive Compensation and Human Resources Committee. Defendant Pegus received and continues to receive handsome compensation for her role as a Company director. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

106. Additional reasons that demand on Defendant Sununu is futile to follow. Defendant Sununu has served as a Company director since April 2009. He also served as the Chair of the

Nominating and Governance Committee and as a member of the Audit Committee at all relevant times. Defendant Sununu received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

107. Additional reasons that demand on Defendant Wichmann is futile follow. Defendant Wichman has served as a Company director since June 2021. He also serves as the Chair of the Audit Committee and as a member of the Risk, Science and Technology Committee. Defendant Wichmann received and continues to receive handsome compensation for his role as a Company director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

108. Additional reasons that demand on Defendant Zane is futile follow. Defendant Zane has served as a Company director since April 2016. She also serves as the Chair of the Executive Compensation and Human Resources Committee and as a member of the Nominating and Governance Committee. Defendant Zane received and continues to receive handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, her insider sales made while the price of the Company's stock was artificially inflated

due to the misrepresentations discussed herein further demonstrate her motive in participating in the fraud.

109. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Boston Scientific's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

110. Furthermore, demand, in this case, is excused because the Director Defendants derive substantial revenue from the Company, control the Company, and are indebted to each other. The Director Defendants have longstanding business and personal relationships with each other and with other Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders

111. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

112. The Director Defendants who serve on the Audit Committee are not disinterested or independent. The purpose of the Audit Committee is to assist the Company's directors with fulfilling their oversight responsibilities regarding, among other things, accounting, legal, regulatory, and public disclosure requirements. Therefore, the Defendants knowingly or recklessly allowed the aforementioned improper statements.

113. The Director Defendants who serve on the Risk, Science and Technology Committee are not disinterested or independent. The Risk, Science and Technology Committee is responsible for, *inter alia*, the oversight of compliance with the Code of Conduct, reviewing and assessing the Company's science, technology, and innovation strategy and priorities, and staying informed of potential disruptive science and technology trends, opportunities and risks. The Risk, Science and Technology Committee members downplayed the impact of new entrants in Boston Scientific's EP segment providing guidance and input to the Board and management and failed to report violations of the Code of Conduct.

114. Significantly, the Director Defendants have taken no remedial action to redress the conduct alleged herein. Non-parties Cathy R. Smith and Christophe P. Weber have likewise taken no action to correct this misconduct.

115. Accordingly, a pre-suit demand on the Board is futile and excused.

## <u>COUNT I</u>

### Against the Individual Defendants for Breach of Fiduciary Duty

116. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

118. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

119. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120. In breach of their fiduciary duties owed to Boston Scientific, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, inter alia, that: (1) the impact new entrants to the market would have on the EP segment was understated; (2) the growth rate and competitive advantage of the EP segment was overstated; and (3) therefore, the Company's financial outlook as provided to investors lacked a reasonable basis. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

121. Moreover, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, six of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information.

122. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

123. In further breach of their fiduciary duties, the Individual Defendants caused the

Company to fail to maintain internal controls.

124. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

125. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

**COUNT II**

**Against the Individual Defendants for Unjust Enrichment**

126. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Boston Scientific.

128. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Boston Scientific that was tied to the performance or artificially inflated valuation of Boston Scientific, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

129. Plaintiff, as a shareholder and a representative of Boston Scientific, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and

breach of their fiduciary and contractual duties.

130. Plaintiff on behalf of Boston Scientific has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Waste of Corporate Assets**

131. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

133. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring massive legal liability and/or legal costs.

134. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

135. Plaintiff on behalf Boston Scientific has no adequate remedy at law.

**COUNT IV**

**Against Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello for Contribution Under Sections 10(b) and 21D of the Exchange Act**

136. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

137. Boston Scientific and Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities

Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Mahoney's, Monson's, Stein's, Fitzgerald's, and Spadea-Anello's willful and/or reckless violations of their obligations as officers and/or directors of Boston Scientific.

138. Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello, because of their positions of control and authority as officers and/or directors of Boston Scientific, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Boston Scientific, including the wrongful acts complained of herein and in the Securities Class Action.

139. Accordingly, Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

140. As such, Boston Scientific is entitled to receive all appropriate contribution or indemnification from Defendants Mahoney, Monson, Stein, Fitzgerald, and Spadea-Anello.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Awarding punitive damages;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 23, 2026

By: */s/ Elizabeth Donohoe*

Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net

*Counsel for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Vincent A. Licata
225 Broadway, Suite 3707
New York, NY 10007
sdr@rl-legal.com
vl@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar, Esq.
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
267-507-6085
www.GrabarLaw.com

*Counsel for Plaintiff*

# VERIFICATION

I, Elliot Feder, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Boston Scientific Corporation common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 4/10/2026

Signed by:
3E8005F3B78D4B1...
ELLIOT FEDER